IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHER DISTRICT OF ILLINOIS
EASTERN DIVISION

ILLINOIS CENTRAL RAILROAD
COMPANY,

        Plaintiff,

   v.

BROTHERHOOD OF MAINTENANCE
OF WAY EMPLOYEES, DIVISION
OF INTERNATIONAL BROTHERHOOD
OF TEAMSTERS,

        Defendant.

Case No. 14 C 3989

Judge Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

I. BACKGROUND

This case arises out of a labor dispute concerning the application of certain cost of living adjustments under two successive collective bargaining agreements governed by the Railway Labor Act (the "RLA"). Plaintiff Illinois Central Railroad Company ("Illinois Central") is a major rail carrier that operates across the central United States, and Defendant Brotherhood of Maintenance of Way Employees, Division of International Brotherhood of Teamsters (the "Union") is a labor organization that represents maintenance-of-way workers employed by Illinois Central. In 1991, Illinois Central and the Union became parties to a national labor agreement that was imposed

pursuant to congressional legislation. To protect employees against wage erosion during the often lengthy RLA bargaining process, the imposed agreement provided for automatic cost of living adjustments ("COLA") that would kick in at scheduled intervals one year after the original contract lapsed and continue until a new labor agreement was reached. This type of provision is better known in the railway industry as a "Harris COLA" – a moniker derived from the name of the Chairman of the Presidential Emergency Board that had been convened at that time for the purpose of resolving the parties' labor disputes.

In following years, Illinois Central and the Union continued to incorporate revised and updated Harris COLA provisions into their successor agreements. Thus, in 2007, when the parties entered into a collective bargaining agreement that was effective retroactively from July 1, 2005, through to July 1, 2009 (the "2005-2009 CBA"), they included a Harris COLA entitling Union employees to wage adjustments every six months beginning in July 2010. As in previous agreements, the 2005-2009 CBA also provided for annual general percentage increases to employees' hourly rates of pay for all years for which the agreement was effective. Any back pay owed for prior years now covered under the contract was to be paid to employees in a lump sum "less any COLA amounts previously received" under the Harris

COLA as set forth in the parties' preceding bargaining agreement.

When the parties failed to adopt a new agreement following the expiration of the 2005-2009 CBA, Union employees began receiving Harris COLA increases as scheduled. Eventually, a successor agreement was negotiated in February 2014 (the "2014 CBA"), which provided for retroactive pay increases commencing in July 2010, the month when the first of the Harris COLA payments had come due under the 2005-2009 CBA.

Unlike prior agreements, however, the 2014 CBA did not expressly eliminate or modify the Harris COLA in place under the 2005-2009 CBA or contain any language substituting that provision for a new one. Similarly, in contrast to previous agreements, which had authorized Illinois Central to reduce its retroactive wage payments by amounts already remitted to employees pursuant to the Harris COLA, the 2014 CBA was silent on the issue of how back pay sums would be calculated.

Despite the absence of those provisions, Illinois Central proceeded as it had in the past by calculating employees' wages as though the previous Harris COLA increases no longer applied and instead referring only to the new negotiated percentage wage increases. Illinois Central also continued with its previous practice of deducting the amounts employees had received under

the Harris COLA from what it determined was owed in overall back pay under the 2014 CBA.

The Union objected to Illinois Central's approach, contending that, because the 2005-2009 CBA's Harris COLA provision had been left unmodified by the 2014 CBA, the employees were entitled to receive not only the percentage wage increases called for by the parties' new agreement, but also the accumulated value of the previous Harris COLA increases. So, for example, when a general 3.8% raise established under the 2014 CBA went into effect on July 1, 2014, it was the Union's position that employees' wages at that time also should have been upped by an additional 4.1% – the accumulated value of prior COLA increases – on top of the 3.8% increase. The Union further took issue with Illinois Central's attempts to offset from its back pay calculation the payments that it had made previously under the Harris COLA.

The Union threatened to strike over this disagreement, which prompted Illinois Central to seek intervention in this Court by requesting that the Union be enjoined from striking and the matter be referred to arbitration in a manner consistent with the requirements of the RLA. The Court heard argument and testimony on the issue on January 8, 2015 (the "January 8 Hearing"). The parties also submitted documentary evidence and several declarations, as well as detailed pre-hearing and post-

hearing memoranda, all of which the Court has reviewed and considered fully.

## II. DISCUSSION

Resolution of this case depends upon how the parties' dispute is classified under the RLA. Disagreements relating to bargaining agreements governed by the RLA are divided into two types: (1) "major" disputes, which are those that "relate to the formation of collective [bargaining] agreements or efforts to secure them," and (2) "minor" disputes, which "involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Hawaiian Airlines, Inc. v. Norris,* 512 U.S. 246, 252-53 (1994). This distinction is important because unions do not have a right to strike or even litigate in federal court over minor disputes, which instead must be submitted to binding arbitration before either the National Railroad Adjustment Board or an adjustment board established by the parties. *Bd. of Maint. of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co.,* 138 F.3d 635, 638 (7th Cir. 1997); *see also,* 45 U.S.C. § 184. In contrast, major disputes are settled through the lengthy bargaining process outlined in the RLA, after which, if no agreement has been reached, "the parties may resort to the use of economic force." *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n ("Conrail"),* 491 U.S. 299, 303 (1989).

Although their definitions are relatively straightforward, distinguishing between major and minor disputes is not always easy. *See, Nat. Ry. Labor Conf. v. Int'l Ass'n of Machinists,* 830 F.2d 741, 748 (7th Cir. 1987). The key difference is that major disputes relate to disagreement over the creation of new contractual rights, while minor disputes concern the enforcement of existing ones. *Elgin, J. & E.R. Co. v. Burley,* 325 U.S. 711, 723 (1945). Thus, courts must "look[] to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action." *Conrail,* 491 U.S. at 302. If the parties' disagreement "may be conclusively resolved by interpreting the existing agreement," it is a minor dispute. *Id.*

An employer's reliance on a contractual right ordinarily is enough to confirm the existence of a minor dispute unless it is clear that the employer's claim in that regard is "insincere" or founded upon "insubstantial grounds." *Conrail,* 491 U.S. at 306. So long as the employer's position is "arguably justified" by the terms of the existing agreement, however, the dispute is classified as minor and is sent to mandatory arbitration. *Id.* at 308.

Illinois Central contends that this case presents a "classic" minor dispute because the existing agreement reasonably can be read to support both its position that

employees are not entitled to continue to receive COLA increases on top of the pay raises negotiated under the 2014 CBA, as well as its decision to subtract from its back pay calculation any amounts previously paid to employees under the 2005-2009 CBA's Harris COLA. With regard to the interplay between the Harris COLA and the prospective wage increases set forth in the 2014 CBA, Illinois Central advances two alternative arguments: first, it contends that the 2005-2009 CBA's Harris COLA was superseded entirely by the revisions contained within the 2014 CBA; second, it argues that, even if the previous Harris COLA survives under the 2014 CBA, it should be understood only to take effect one year after the date of the last percentage wage increase negotiated under the 2014 CBA. As for the issue of back pay under the 2014 CBA, Illinois Central argues that deducting amounts paid out under the 2005-2009 CBA's Harris COLA not only makes common sense but also is consistent with the parties' practice under previous agreements and established practice in the railway industry.

All of these assertions are at least "arguably justified" under the terms of the parties' existing agreement. *See, Conrail,* 491 U.S. at 308. Turning to the first of Illinois Central's arguments, there is substantial support for the contention that the 2014 CBA superseded all prior agreements and, thus, invalidated the 2005-2009 CBA's Harris COLA

provision.  While railway labor bargaining is unique in that contractual terms in previous RLA agreements ordinarily do not expire, but rather remain in effect until modified, *see, In re Northwest Airlines Corp.,* 483 F.3d 160, 167 (2d Cir. 2007), it is entirely plausible that the 2014 CBA did away with the 2005-2009 CBA's Harris COLA provision notwithstanding the fact that the 2014 CBA did not address the COLA issue specifically. Evidencing the parties' intent to implement a complete and independent agreement with regard to the terms of employee compensation, the 2014 CBA contained a "zipper clause," explaining that the purpose of the agreement was to "fix the general level of compensation" through to December 31, 2014 (the end of the contract term).  Having left out any mention of a COLA from the 2014 CBA, it is reasonable to conclude that the parties' present agreement does not authorize further COLA increases.

The soundness of that interpretation is bolstered by the fact that the 2014 CBA was modeled after a national agreement between the Union and several other carriers, which did not contain a COLA provision.  Moreover, in a letter to Illinois Central dated November 5, 2012, the Union's chief negotiator, Donald F. Griffin, complained that a recently ratified agreement between Illinois Central and a different labor organization contained certain "enhancements" that Illinois Central had been

unwilling to offer the Union in its bargaining proposals. (*See,* Pl.'s Trial Ex. 11 at 3). Among those enhancements, Mr. Griffin identified specifically a "post-moratorium cost of living allowance," *i.e.,* a Harris COLA, which plainly suggests that the Union was aware that COLA payments would not be a part of the compensation package provided under the 2014 CBA. Perhaps most significant, however, is a side letter dated August 16, 2014, which clarified that the 3% general wage increase effective January 1, 2015, "was intended to constitute a complete resolution of the compensation adjustment issue for calendar year 2015." (Decl. of Cathy K. Cortez, sworn to on Nov. 14, 2014 ("Cortez Decl."), Ex. 1 at 6, ECF No. 19-1). In view of this evidence, it obviously is a defensible position that employees are not entitled to receive COLA increases on top of the negotiated pay raises for 2015. Indeed, to find otherwise would be to award the employees a substantial and unexplained boon, the likes of which they have never seen under *any* previous agreement.

Despite this proof, the Union contends that, because previous agreements all contained language expressly substituting the existing Harris COLA for a revised and updated one, the absence of any such modifying provision in the 2014 CBA implies that the parties intended for the increases under the 2005-2009 CBA's Harris COLA to remain in effect. Perhaps.

- 9 -

However, as one Special Board of Adjustment ("SBA") has explained in a related context,

> it is not unusual in collective bargaining for parties to state a right (or responsibility) in contract language even though the same right (or responsibility) has previously been expressed elsewhere in the contract or can be reasonably inferred from other language. Surplusage does happen.

(Decision dated Aug. 24, 2000, SBA No. 1123, at 12 (Mittenthal, Neutral)). The 2014 CBA's lack of any explicit provision abandoning the previous Harris COLA thus is not as significant as the Union may think. And, in any event, the possibility of an alternative reading of the contract is not inconsistent with the existence of a minor dispute. The only question is whether there is a plausible interpretation of the existing agreement that supports Illinois Central's position. For the reasons stated above, there is.

Illinois Central's related argument – that, even if the 2005-2009 CBA's Harris COLA does remain in effect, increases pursuant to that provision should not be applied until one year after the parties' last negotiated pay raise – also has traction. Such an interpretation not only avoids the dubious windfall that would be conferred upon employees from the simultaneous payout of negotiated pay raises and increases under the Harris COLA; it also is consistent with the very purpose of a Harris COLA, which, as the Union's own chairman acknowledged

at the January 8 Hearing, is to guard against wage erosion *during the time between when an existing bargaining agreement expires and a new one is reached*. The parties' continued practice of scheduling Harris COLA increases to go into effect one year after their last negotiated raise confirms this basic purpose and it is at least arguable that the Harris COLA in this case should be implemented in a similar manner.

Finally, with respect to Illinois Central's argument that it is entitled to reduce its retroactive pay obligations by amounts employees already received under the 2005-2009 CBA's Harris COLA, that position clearly finds support in the way the parties treated Harris COLA payments in the past, as well the manner in which Harris COLAs generally are administered in the railway industry. The Seventh Circuit has explained that RLA bargaining agreements must be construed with reference to the parties' "practice, usage and custom," as well as "parallel labor agreements, even those involving other parties." *Atchison,* 138 F.3d at 641. In every prior instance in the parties' bargaining history, the Union permitted Illinois Central to deduct from its back pay calculation any payments that had been made to employees pursuant to the then-existing Harris COLA. As Mr. Griffin, the Union's chief negotiator, acknowledged in a letter to various Union higher-ups, Illinois Central's approach was justified because:

> COLA payments are, in effect, a down payment made by the Railroads against the actual retroactive pay increases provided in the [new] agreement. Therefore, the calculation of the backpay will involve, in very general terms, a calculation of the gross backpay provided in the agreement *from which is subtracted the 'down payment' in COLA increases already computed under the [prior] agreement.*

(Cortez Decl., Ex. 7 at 2) (emphasis added).

Subtracting COLA amounts received by employees from the employer's overall retroactive pay calculation also is consistent with standard practice in the railway industry. In a 2007 Report to President George W. Bush, an Emergency Board that had been convened to resolve a dispute between Amtrak and several of its unions explained that Harris COLAs had

> become customary in the industry to mitigate the effects of extended post-moratorium periods without negotiated increases and, following agreement on terms of a successor agreement, offsets are typically provided for Harris COLA payments made during the post-moratorium period.

(Rep. to the President dated Dec. 30, 2007, PEB No. 242, at 26 n.4). With past practice and industry custom both auguring in favor of Illinois Central's proposed back pay calculation, it would be frivolous to suggest that its position on the matter is not at least arguably justifiable under the terms of the parties' existing agreement.

The foregoing demonstrates that the parties' disagreement is a minor dispute; the only remaining question is whether Illinois Central has satisfied the requirements for the issuance of an injunction. Notwithstanding the Norris-LaGuardia Act's general prohibition against the entry of injunctions against labor unions in cases arising out of labor disputes, federal courts have authority to enforce the provisions of the RLA. *United Airlines, Inc. v. Int'l Ass'n of Machinist and Aerospace Workers,* 243 F.3d 349, 362 (7th Cir. 2001). This includes the power to enjoin a union from striking over a minor dispute. *Bd. of R.R. Trainmen v. Chicago R. & I.R. Co.,* 353 U.S. 30, 42 (1957). The Norris-LaGuardia Act's procedural provisions still must be observed, however, which means that the carrier "must put on live testimony with the opportunity for cross-examination . . . or there must be some equivalent guarantee of the reliability of the evidence presented." *United Airlines,* 243 F.3d at 363 n.9 (citations omitted).

There is some uncertainty over whether an injunction must meet the requirements of Section 107 of the Norris-LaGuardia Act or the more familiar general federal standard for injunctive relief. *See, Bd. of Maint. of Way Employees v. Burlington N. and Sante Fe R.R. Co.,* No. 03 C 6247, 2003 WL 22844242, at *5 (N.D. Ill. Nov. 26, 2003). There is no need to resolve that question in this case, however, since it is clear that Illinois

Central has made a showing sufficient to warrant the requested injunction under either standard.

Under Section 107 of the Norris-LaGuardia Act, the Court must make findings of fact to the effect that (1) unlawful acts have been threatened and will be committed unless the union is restrained, (2) substantial and irreparable injury to the employer's property will result from the union's unlawful acts, (3) greater injury will be inflicted upon the employer by the denial of the injunction than will be inflicted on the union by the granting of the injunction, (4) the employer has no adequate remedy at law, and (5) the public officers charged with the duty to protect the employer's property are unable or unwilling to provide adequate protection (this element appears to be inapplicable to this case). 29 U.S.C. § 107.

The general federal injunction standard overlaps substantially with those requirements. In establishing that an injunction is appropriate under that framework, the movant must demonstrate (1) success on the merits (in the case of a preliminary injunction, "likelihood of success" is enough), (2) that it will suffer irreparable harm if the injunction is denied, (3) the absence of any adequate remedy at law, (4) that the harm that it will suffer without injunctive relief outweighs the harm the opposing party will suffer if the injunction is granted, and (5) that the public interest will not be harmed by

the relief requested. *See, e.g., Kiel v. City of Kenosha,* 236 F.3d 814, 815-16 (7th Cir. 2000); *Collins v. Hamilton,* 349 F.3d 371, 374 (7th Cir. 2003).

Because this is a minor dispute and the RLA prohibits striking over such disagreements, Illinois Central has achieved success on the merits of its claim that the Union's planned course of action violates the mandatory dispute resolution procedures set forth in the RLA. Illinois Central thereby also has demonstrated a need to restrain the Union from engaging in the unlawful action threatened in this case.

At the January 8 Hearing, the Union conceded that a strike would cause irreparable harm to Illinois Central. The parties further appear to agree that no adequate remedy at law exists that would compensate Illinois Central for the damage caused by a strike. Nonetheless, Illinois Central presented evidence as to the devastating impact a strike would have on its operations across the central United States. (*See,* Decl. of Brett Jury, sworn to on Nov. 19, 2014, ECF No. 20). Essentially, Illinois Central would be forced to shut down entirely, extreme backups would ensue, and much of the important rail traffic in the region would grind to a halt. Illinois Central would be unable to maintain or use its tracks or equipment and countless communities, businesses, and utilities that rely heavily on rail traffic, such as power stations and automobile plants, would be

affected as well.  Even a temporary shutdown would have lasting effects and any disruption in service would result in permanent and irreparable loss of goodwill and the future business upon which Illinois Central relies.

Given these dire consequences, it is clear that the harm that Illinois Central and the public at large would suffer if the Union were allowed to strike outweighs the inconvenience to the Union of being enjoined from conducting such an illegal strike.  Moreover, an injunction does not leave the Union without recourse.  If the Union wishes to challenge Illinois Central's interpretation of the 2014 CBA, it may do so lawfully by following the appropriate dispute resolution procedures set forth in the RLA.

Finally, there is nothing to suggest that the public interest would be harmed by the issuance of an injunction in this case.  To the contrary, the public has an interest in the peaceful resolution of labor disputes and the uninterrupted operation of essential rail traffic.  Entry of an injunction directing the Union to abide by the RLA serves that interest.

### III. CONCLUSION

For the reasons stated herein, Illinois Central's Application for Preliminary and Permanent Injunctive Relief [ECF No. 18] is granted.  Summary judgment is also granted in favor of Illinois Central and against the Union on all counts set

forth in Illinois Central's Verified Complaint, as well as in the Union's Counterclaim.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 2/5/2015